## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CENTAUR, LLC, et al.,<br><br>            Debtors. | Case No. 10-10799 (KJC)<br><br>**JOINTLY ADMINISTERED**<br>**Chapter 11 Cases** |
| FTI CONSULTING, INC., as Trustee to the Centaur, LLC Litigation Trust,<br><br>           Plaintiff,<br><br>     v.<br><br>JOSEPH SWEENEY and LINDA PORR SWEENEY,<br>           Defendants. | Adversary No. 12-50423 (KJC) |

<u>**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**</u>

**STEVENS & LEE, P.C.**

Joseph H. Huston, Jr. (No. 4035)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 425-3310
Facsimile: (610) 371-7972
Email: jhh@stevenslee.com

-and-

Constantine Pourakis
485 Madison Avenue, 20th Floor
New York, NY 10022
Telephone: (212) 319-8500
Email: cp@stevenslee.com

*Attorneys for Defendants Joseph Sweeney and*
*Linda Porr Sweeney*

# TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDING ................................................................1

    A.   Nature of the Proceeding...........................................................................................1

    B.   Procedural History and Stage of the Proceedings ....................................................1

II.   STATEMENT OF FACTS ...................................................................................................4

    A.   Memorandum of Understanding ...............................................................................4

    B.   2007 Lien Facilities..................................................................................................4

    C.   October 2007 Sale Agreement .................................................................................6

    D.   Closing of 2007 Lien Facilities and Flow of Funds Memorandum ..............................7

III.  ARGUMENT.......................................................................................................................8

    A.   Summary Judgment Standard ...................................................................................8

    B.   The Transfers Are Protected by Bankruptcy Code Section 546(e)................................8

        1.   Plain Language of Sale Agreement Proves Sale of the Sweeneys' Interests Was the Intent of the Parties ...............................................................13

        2.   Relevant Caselaw Supports the Conclusion That a Sale Occurred, Meriting Protection under Section 546(e) ...........................................................14

    C.   There Exist Genuine Disputes of Material Facts Concerning Solvency, Requiring Denial of Summary Judgment...................................................................16

        1.   Failure to Demonstrate Lack of Reasonably Equivalent Value ..........................17

        2.   Plaintiff's Insolvency Is Belied by the Documentary Evidence..........................19

        3.   Plaintiff's Parsing of Debtors' Solvency and Valley View Downs' Insolvency is of No Consequence ....................................................................21

IV.   CONCLUSION ................................................................................................................23

SL1 1369210v2 107213.00001

# TABLE OF AUTHORITIES

CASES

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)..................................................................................................8

*Assaf v. Fields*,
178 F.3d 170 (3d Cir. 1999)......................................................................................8

*Charys Liquidating Trust v. McMahan Sec. Co., L.P. (In re Charys Holding Co.)*,
443 B.R. 628 (Bankr. D. Del. 2010) .......................................................................16

*Emory v. United States*,
374 F.Supp. 1051 (E.D. Tenn. 1972) ......................................................................14

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. et al.*,
651 F.3d 329 (2d Cir. 2011)....................................................................................15

*Foxman v. Comm'r of Internal Revenue*,
352 F.2d 466 (3d Cir. 1965)....................................................................................14

*Hill v. City of Scranton*,
411 F.3d 118 (3d Cir. 2005)......................................................................................8

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993)........................................................................................3

*Official Committee of Unsecured Creditors v. Acres of Diamonds, L.P. (In re The IT Group, Inc.)*,
359 B.R. 97 (Bankr. D. Del. 2006) ...........................................................................9

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005)....................................................................................17

*In re Plassein International Corp.*,
590 F.3d 252 (3d Cir. 2009)................................................................................9, 10

*Resolution Trust Corp. v. Gill*,
960 F.2d 336 (3d Circ. 1992)....................................................................................8

*In re Resorts International, Inc.*,
181 F.3d 505 (3d Cir. 1999)................................................................................9, 15

*Sarachek v. The Right Place Inc. (In re Agriprocessors, Inc.)*,
2011 WL 4621741 (Bankr. N.D. Iowa Sept. 30, 2011) ..........................................17

*Walker v. Sonafi Pasteur (In re Aphton Corp.)*,
    423 B.R. 76 (Bankr. D. Del. 2010) ..........................................................19

**STATUTES, RULES & REGULATIONS**

11 U.S.C. § 101(16) (B) ..........................................................................13

11 U.S.C. § 101(22) (A) ..........................................................................15

11 U.S.C. § 548(d)(2) ........................................................................18, 19

11 U.S.C. § 741(8) ..............................................................................9, 15

11 U.S.C. § 546(e) .........................................8, 9, 10, 12, 13, 14, 15

Section 548(a)(1)(B) of the Bankruptcy Code ....................................16, 17

Fed. R. Civ. P. 56(a) ..............................................................................7

Fed. R. Evid. 701 ...................................................................................3

SL1 1369210v2 107213.00001

# I.   NATURE AND STAGE OF THE PROCEEDING

## A.   Nature of the Proceeding

This is an Adversary Proceeding commenced by the filing of the Complaint by Plaintiff against Defendants Joseph Sweeney and Linda Porr Sweeney (the "Sweeneys") on March 16, 2012.  The Complaint alleges federal and Pennsylvania state law claims, and consists of four causes of action:

> (1) Avoidance and recovery of two allegedly constructively fraudulent transfers pursuant to sections 548 and 550 of the Bankruptcy Code; and
>
> (2) Avoidance and recovery of two allegedly constructively fraudulent transfers pursuant to Pennsylvania state law.

Complaint ¶¶ 30-56.

## B.   Procedural History and Stage of the Proceedings

On October 28, 2009, Valley View Downs, a Pennsylvania limited partnership ("VVD") and Centaur PA Land, a Pennsylvania limited partnership, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware.  VVD and Centaur PA Land are wholly owned subsidiaries of Centaur, LLC ("Centaur LLC").

On March 6, 2010, Centaur LLC and twelve of its wholly owned subsidiaries also filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The bankruptcy case of these debtors along with the bankruptcy cases of VVD and Centaur PA Land (collectively, the "Debtors") are jointly administered under Case No. 10-10799.

The Court entered its Order confirming the Debtors' plan of reorganization on February 18, 2011.  The Litigation Trust was thereby created and FTI Consulting, Inc. was

1

appointed as Trustee ("<u>Plaintiff</u>") to act on behalf of the Litigation Trust. This action was commenced on March 16, 2012. Notably, as set forth in the Verified Disclosure Statement for the Fourth Amended Plan of Reorganization (Docket No. 766), the distributions by the Litigation Trust accord special treatment for those holding claims against or avoidance actions related to Valley View Downs, the bulk of which are held by Credit Suisse and the other prepetition first- and second-lien secured lenders, all of whom were willing--indeed, eager-- sophisticated participants in the financing transaction:

> Holders of Litigation Trust Interests that received such interests pursuant to <u>Section 5.2, Section 5.3</u>, <u>Section 5.5</u> or <u>Section 5.8</u> of the Plan on account of Claims against Valley View Downs, LP shall receive distributions from the Litigation Trust of the proceeds of only those Designated Avoidance Actions that result in the recovery of property transferred, or the value of the property transferred, by Valley View Downs, LP, and each such holder shall receive a pro rata share (by amount) of each such distribution in accordance with such holder's pro rata share (by amount) of the aggregate amount of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims and, in certain circumstances, Allowed Intercompany Claims against Valley View Downs, LP.

> Id. ¶ X.F(g), at 84.

As noted within at page 12, the current claims register does not reflect any claims against VVD other than Wells Fargo's $207 million second lien secured claims. The Disclosure Statement also recites that unsecured claims against VVD were being separately classified (Class 5) and were estimated at $0-$61.2 million, all of which was held by a single creditor and was asserted to be either unenforceable for want of consideration, or subject to recharacterization as equity or disallowance; and that the estimated distribution for that class was 0.7% at best. Disclosure Statement at 16 & n. 9, 18 & 59. In other words, there were no claims against VVD other than the secured lenders' claims arising from the financing, and no less than 99.3% of every dollar recovered will go to the lenders.

On April 27, 2012, the Sweeneys moved to dismiss the Complaint (Docket Nos. 4, 5). By Order dated August 19, 2013, the Court denied the motion to dismiss (Docket No. 26). The Court denied the motion to dismiss by way of a Memorandum and Order, in doing so holding that there were too many factual issues to be resolved, including (i) whether reasonably equivalent value had been exchanged and the issue of solvency, both of which the Court noted were necessarily highly factual in nature and not susceptible of disposition on the record presented; and (ii) whether the "safe harbor" defense applies, because the parties disputed the nature of the transaction giving rise to the lawsuit. Nothing has changed to remove those factual issues, as many of the documents relied upon by the Plaintiff are largely the same as those relied upon by the Sweeneys in their motion to dismiss.

In addition  the credibility of the Plaintiff's expert and his report are disputed by the Sweeneys. The expert report is only guidance and not binding on the Court, and is subject to cross-examination and rebuttal at trial. The credibility of the expert and the weight, if any, to be given to his report are inherently factual determinations for the Court to make on a full evidentiary record. The Sweeneys were significant equity holders of VVD and Mr. Sweeney was the active manger of the business up until the sale of the equity interest. He was thus intimately familiar with its financial position and prospects, and clearly has the right to offer testimony on those subjects under Federal Rule of Evidence 701; *e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175-76 (3d Cir. 1993).

For some unknown reason, the Plaintiff inserts in its brief complaints that the Sweeneys failed to supply Rule 16 disclosures when in point of fact all such information was already known to it,  there has been a constant flow of information between counsel, and the Sweeneys produced thousands of pages of documentation in response to discovery requests. In the course of the mediation and settlement discussions, they also provided substantial amounts of

confidential personal financial and other documentation to which the Plaintiff was not otherwise entitled. If the Plaintiff were really concerned that it had somehow been prejudiced, it had a way to seek relief which it never mentioned or chose to pursue. Its complaint should simply be ignored.

## II.    STATEMENT OF FACTS

### A.    Memorandum of Understanding

On or about October 7, 2004, a Binding Memorandum of Understanding ("MOU") was executed and delivered by the Sweeneys, VVD, Centaur Pennsylvania, LLC, and Michael C. Forman ("Mr. Forman"). (A416-40) (References are to the Declaration of Gregory S. Schwegmann in Support of Plaintiff's Motion for Summary Judgment (Adv. Pro. Docket No. 53)). The MOU concerned VVD's interest in constructing a harness racing track and casino, known in the trade as a "racino," on property located in Beaver County, Pennsylvania (the "Venture"). (*Id.*). Up to the date of the MOU, Mr. Sweeney had been in charge of all aspects of developing and bringing to fruition all of Centaur's Pennsylvania's gaming operations. (*Id.*). Centaur had decided to assume those responsibilities, and thus the parties entered into the MOU.

Pursuant to the MOU, the Sweeneys were issued an 8% interest in VVD's common equity. (*Id.*). Mr. Sweeney, directly and through his company, continued to serve as consultant to the Venture.

### B.    2007 Lien Facilities

Three years later, Centaur undertook a major capital raising effort to fund its various gaming operations. In September 2007, Credit Suisse, acting as Lead Arranger, distributed a "Preliminary Confidential Executive Summary" (the "Executive Summary") to various financial institutions to raise funds for a $630 million First Lien Credit Facility (the "2007 First Lien

Credit Facility") (A83-241) and $130 million Second Lien Credit Facility (the "2007 Second Lien Credit Facility," [A263-393] together with the 2007 First Lien Credit Facility, the "2007 Lien Facilities") for Centaur, LLC. Sweeney Decl. *See also* the accompanying Declaration of Joseph Sweeney ("Sweeney Decl."), Sealed Ex. E.[1] Consistent with the terms of the Executive Summary, the 2007 First Lien Credit Facility consisted of a $25 million Revolving Credit Facility with a 5-year term, a $455 million Senior Secured Term Loan with a six-year term, a $50 million Letter of Credit, and $100 million 12-Month Delayed Draw Senior Secured Term Loan. Pursuant to the terms of the Executive Summary, Credit Suisse and other then-unnamed financial institutions were to be the lenders, and Credit Suisse was to hold a first priority perfected lien on all property and assets of Centaur, LLC and all of its subsidiaries, including VVD.

Of signal importance in this litigation and as noted above, is that under the confirmed Plan of Reorganization, the bulk of any recoveries from VVD's gerrymandered avoidance actions will go to benefit Credit Suisse and the other prepetition secured lenders, the very parties who put together and eagerly participated in the financing. Credit Suisse, "Lead Arranger," first lien agent and lender, "sold" the transaction to the parties and participants on the basis of the valuations and financial analyses *it* commissioned and controlled, and participated in and approved the negotiated price for the value of the Sweeney and Forman interests, and is a member of the post-confirmation Litigation Trust's oversight committee.

In addition, by the terms of the Executive Summary, there was also a 2007 Second Lien Credit Facility comprised a $130 million second lien credit facility. Credit Suisse and other then-unnamed financial institutions were also to be the lenders on the 2007 Second Lien Credit

---

[1] This Exhibit was previously filed under seal pursuant to an Order of this Court dated May 1, 2012 (Docket No. 7). As a result, this Exhibit will not be filed on the docket, but will be provided only to the Court and Plaintiff's counsel in sealed hard copy.

Facility, and Credit Suisse was to hold a second priority perfected lien on all property and assets of Centaur, LLC and all of its subsidiaries, including VVD, junior in lien and payment to the 2007 First Lien Credit Facility.

**C.    October 2007 Sale Agreement**

Centaur had decided to consolidate in itself all of the equity in VVD to assume complete control of the Venture. Therefore, by Agreement dated October 1, 2007 (the "<u>Sale Agreement</u>"), as an integral part of the omnibus $800 million financing for Centaur's various entities and ventures and not as some separate "side deal," VVD, Centaur Pennsylvania, LLC, and Centaur, LLC, agreed to purchase --actually insisted that they purchase-- and the Sweeneys agreed to sell their 8% equity stake for a price negotiated at arm's length of $11,199,000. (A442-72).[2] In consideration for the transfer of the Sweeneys' equity interest in VVD, they were to receive (i) an initial payment of $8,532,333.00 in cash on or about October 31, 2007 (the "<u>2007 Cash Transfer</u>"); and (ii) delivery on or before October 31, 2007 of a Promissory Note payable to them and Mr. Forman (the "Note") in the amount of $5,000,000 to cover payment of the balance of the purchase price of $2,666,667 and the balance of amounts owed to Mr. Forman, payable with interest on or before July 1, 2008 (the "<u>Note Repayment</u>"). (A442-72).

On October 1, 2007, In accordance with the Sale Agreement, VVD executed and delivered the Promissory Note jointly to the Sweeneys and Forman. (A504-07). The Plaintiff and its purported expert refer to this transaction as having been a redemption of equity interests or anything else in an obvious attempt to avoid the otherwise clear safe-harbor defense. As detailed at pages 12-13 within, none of the transaction documents describes the transaction as a redemption, rather as the "Purchase Transaction," whereas the Sale Agreement contains a

---

[2]  Although the Sale Agreement refers to the Sweeneys' conveying other rights under the MOU, there were no such rights and it is clear that the Debtors were purchasing only the equity interests. (*See* A416-440; A442-472).

separate Article which clearly addresses a separate "Redemption Transaction" with Mr. Forman. If a redemption is what the parties had intended, they would have said so.

### D. Closing of 2007 Lien Facilities and Flow of Funds Memorandum

The 2007 Lien Facilities closed on or about October 30, 2007, and a Flow of Funds Memorandum was issued, detailing where the proceeds of the nearly $800,000,000 were to go and what obligations they were to pay. (A489-502). Step 8 of the Flow of Funds Memorandum – entitled "Stewart Title Escrow" – provides that "[a]n aggregate amount equal to $80,639,409.35 will be wired by Credit Suisse to the account of Stewart Title Guaranty Company [] representing the sum of the amounts set forth on Schedule 1." (A492).

Schedule 1 to the Flow of Funds Memorandum provides that the payment of the 2007 Cash Transfer of $8,532,333 from Credit Suisse to the Sweeneys was to be made from the Stewart Title Escrow account. (A501-02).

Step 16 of the Flow of Funds Memorandum – entitled "Excess Funds" – provides that "all excess funds will be wired to Centaur, LLC." (A497). As shown on the Centaur Gaming General Corporate Uses Account Reconciliation, annexed as Exhibit A to the Sweeney Declaration, a portion of those funds was used to make the Note Repayment to the Sweeneys in July 2008.

Of material importance is that section 2.2 of both of the Subsidiary Guarantees related to the 2007 financing, Exhibits F (at A245) and H (at A396) to the declaration in support of the Plaintiff's motion, specifically provided that a Guarantor's liability was limited to the amount that would not render the Guaranty subject to avoidance as a fraudulent transfer under section 548 or any state law. By virtue of those provisions, neither could VVD have guaranteed an amount which would have rendered avoidable any roughly contemporaneous transaction or

undertaken obligation-- such as the undertakings and anticipated payments to the Sweeneys -- because the two necessarily would go hand in hand.

## III.  ARGUMENT

### A.  Summary Judgment Standard

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).  A genuine dispute of material fact is present when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986).

In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party.  *Anderson v. Liberty Lobby*, 477 U.S. at 257; *Assaf v. Fields*, 178 F.3d 170, 173-174 (3d Cir. 1999).  "Where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the [Court] should deny summary judgment even if no opposing evidentiary matter is presented." *Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Circ. 1992).

Plaintiff is not entitled to judgment as a matter of law because the transfers at issue are protected from avoidance under Bankruptcy Code section 546(e).  Furthermore, there exist genuine issues of material fact concerning reasonable equivalence of value for the transfers and the Debtors' solvency at the time.  Summary judgment must therefore be denied.

### B.  The Transfers Are Protected by Bankruptcy Code Section 546(e)

Summary judgment must be denied because the transfers at issue are protected by Bankruptcy Code section 546(e); Plaintiff is therefore not entitled to judgment as a matter of law.

8

Section 546(e) of the Bankruptcy Code provides an exception to the avoidance of a constructive fraudulent conveyance when the payment is a securities "settlement payment":

> Notwithstanding section[] … 548(a)(1)(B) … of this title, the trustee may not avoid a transfer that is a … settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a … financial institution … that is made before the commencement of the case …

11 U.S.C. § 546(e).

"Settlement payment" is defined as a "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8).

The Third Circuit espouses an "extremely broad" definition of "settlement payment," finding that a settlement payment may be made either on the publicly traded exchange or through a private securities transaction. *E.g., In re Resorts International, Inc.*, 181 F.3d 505, 514-15 (3d Cir. 1999) (settlement payment on publicly traded shares); *In re Plassein International Corp.*, 590 F.3d 252, 258 (3d Cir. 2009) (settlement payment on privately traded shares).

Consequently, the Third Circuit also broadly interprets Bankruptcy Code section 546(e), holding that a settlement payment made by a "financial institution,", 11 U.S.C. § 101(22)(A), is exempt from a constructive fraudulent conveyance claim. *In re Resorts*, 181 F.3d at 515, 516 (dismissing fraudulent conveyance complaint, holding transfer of money from financial institution to customer on stock sale is settlement payment protected from such claim); *In re Plassein*, 590 F.3d at 258-59 (holding "transfer of cash or securities made to complete a transfer payment" protected by section 546(e)); *Official Committee of Unsecured Creditors v. Acres of Diamonds, L.P. (In re The IT Group, Inc.)*, 359 B.R. 97, 101-102 (Bankr. D. Del. 2006) (following *Resorts*, holding transfer of payment by Debtor's financial institution to equity holder

to complete purchase of stock protected from avoidance as a section 546(e) "settlement payment").

The *Resorts* decision defined "settlement payment" broadly, finding that "a settlement payment is generally the transfer of cash or securities made to complete a transfer payment." 181 F.3d at 515. The Third Circuit further concluded that "[a] payment for shares … is obviously a common securities transaction, and we therefore hold that it is also a settlement payment" for the purposes of section 546(e). *Id*. at 516. *Plassein* expanded the scope of the protection by holding that section 546(e) protects settlement payments related to the settlement of both publicly traded and privately traded shares. *Plassein*, 590 F. 3d at 258-59.

Despite Plaintiff's apparent hopes to the contrary, the 2007 Cash Transfer and Note Repayment are each protected by section 546(e). In October 2004, the MOU was executed by the Sweeneys, VVD, Centaur Pennsylvania, LLC, and Forman, whereby the Sweeneys were issued an 8% interest in VVD's common equity. (A416-A440).

Prior to – and as one of the objects of – the closing on the 2007 Lien Facilities, Centaur decided that it wanted to own all of the equity in the Venture and offered to repurchase the interests of the Sweeneys and Mr. Forman. VVD, Centaur Pennsylvania, LLC, Centaur, LLC, and the Sweeneys executed the Sale Agreement, whereby the Debtors agreed to repurchase the Sweeneys' 8% equity interest in VVD. (A442-72). Although the cash budget for the capitalization transaction shows that $22 million was being raised to pay the Sweeneys and Mr. Forman in full, I was not used precisely that way. In consideration for the transfer of their interests in VVD, the Sweeneys and Mr. Forman were to and did receive cash and the $%5million Promissory Note. (A504-A507). Thus, $5 million of the funds raised to pay the amount of the Promissory Note actually stayed with the Debtors and ultimately with VVD.

The 2007 Lien Facilities closed on or about October 30, 2007, and the Flow of Funds Memorandum lists how and where the proceeds of the nearly $800,000,000 was to go. (A489-A502). Step 8 of the Flow of Funds Memorandum – entitled "Stewart Title Escrow" – provides that "[a]n aggregate amount equal to $80,639,409.35 will be wired by Credit Suisse to the account of Stewart Title Guaranty Company [] representing the sum of the amounts set forth on Schedule 1." (A492). Schedule 1 to the Flow of Funds Memorandum lists the payment of the 2007 Cash Transfer of $8,532,333 to the Sweeneys was to be made from that account in partial payment of the purchase price under the Sale Agreement. (A501-02). As noted above, the Subsidiary Guarantees prohibited VVD from guaranteeing any amount which would render the obligations being incurred avoidable as fraudulent transfers. This was in essence a built-in solvency/reasonable equivalent value protection for the transactions anticipated by the financing, which would necessarily include the payments to the Sweeneys expressly provided for in the Flow of Funds Memorandum.

According to the Motion for Joint Administration filed in these cases (Docket No. 3), "on or about September 17, 2008, Holdings, Centaur, LLC and the Restricted Subsidiaries entered into a $180 million amended and restated second lien revolving and term loan agreement (the "Second Lien Credit Facility") with Wells Fargo Bank, N.A. as successor administrative agent and successor collateral agent...." Id. ¶ 16. This was *after* the payment made on the Note in July 2008. In addition, the Motion for Joint Administration recited the integrated nature of the Centaur entities and their positive cash flow, and that VVD's project was still very much in process:

> The Debtors are leading domestic horse racing, off-track betting ("OTB")
> and casino operators with approximately 219,000 square feet of combined
> gaming space. The Debtors currently own, operate, and/or have interests
> in racing and casino facilities in five distinct gaming markets in Indiana
> and Colorado, with a project in progress in northwest Pennsylvania.

SL1 1369210v2 107213.00001

The Debtors hold a racing, gaming and entertainment development opportunity, to be known as "Valley View Downs", In Lawrence County, Pennsylvania, 55 miles northwest of Pittsburgh. The Debtors currently own approximately 250 acres of land upon which they plan to construct Valley View Downs. In September 2007, the Debtors secured a racing license for Valley View Downs which entitles the Debtors to a gaming license subject to securing certain regulatory approvals. As of the Petition Date, the Debtors have not yet secured all necessary approvals and licenses for the completion of Valley View Downs.

The Debtors' businesses generate positive cash flow from operations. For the fiscal year ended December 31, 2008, the Debtors generated approximately $184 million in revenues. For the fiscal year ended December 31, 2009, the Debtors generated approximately $277.5 million in revenues. As of the Petition Date, the Debtors' books and records (on a consolidated basis) reflected assets totaling approximately $584 million and liabilities totaling approximately $681 million.

Id. ¶¶ 7, 10-11.

Nowhere in the litany of events leading to the Chapter 11 cases thereafter recited in the motion is there any suggestion that the transaction with the Sweeneys and Mr. Forman in any way contributed to the filings.

The claims register in VVD's bankruptcy case (Docket No. 23, Case No. 09-13761), updated as recently as April 27, 2015, reflects that the only claims asserted against any of the VVD entities is a claim of approximately $207 million by Wells Fargo; Claims No. 201,210, 211 and 212.

The list of Designated Avoidance Actions (Sweeney Decl., Exhibit D) attached to the Debtors' Plan of Reorganization is an admission by the Debtors (and as a result, Plaintiff) that the 2007 Cash Transfer and Note Repayment were settlement payments protected by section 546(e). The list clearly states that the nature of the 2007 Cash Transfer was "Payment for Equity Interests (first installment)" and the Note Repayment was "Payment for Equity Interests (second installment)". Sweeney Decl., Exhibit D.

### 1. The Plain Language of Sale Agreement Proves Sale of the Sweeneys' Interests Was the Intent of the Parties

Article 1 of the Sale Agreement is entitled "Purchase Transaction." Section 1.01 of the Sale Agreement (A442) is entitled "Acquisition of Investors' Rights under MOU," and provides in relevant part: "VVD shall acquire from each and all of the Investors, and each of the Investors shall <u>transfer, assign, convey</u> and relinquish to VVD, any and all … (a) ownership interests in VVD" (emphasis added).

Section 1.02 of the Sale Agreement, entitled "Purchase Price," (A443) provides: "in consideration of the <u>acquisition</u> of the Investors' <u>ownership interests</u> and other rights under the MOU …." (emphasis added).

Last, Section 1.03 of the Sale Agreement (A446) provides: "Effective as of payment by VVD and receipt by the Investors of the Initial Payment []: (a) the rights and interests referred to in ["Acquisition of Investors' Rights under MOU"] shall be deemed to have been automatically <u>transferred, assigned, conveyed</u> and relinquished by the Investors to VVD, without the requirement of any further documents, deliveries or actions on the part of the Investors" (emphasis added).

In contrast, the Sale Agreement recited in the preamble that "Centaur and Forman [had] entered into a *Redemption* Agreement ... pursuant to which Centaur purchased *and redeemed* from Forman ... a four percent (4%) profits interest ..." (emphasis added), and that Centaur and Forman wished to amend that agreement. The Sale Agreement's Article 2, entitled "Redemption Transaction," then provided that Centaur would pay Mr. Forman a separate "Redemption Amount." Therefore, when the parties wanted to describe a purchase and sale in exchange for a "Purchase Price," they knew how to say so; and when they wanted to do a redemption (of an

entirely separate type of interest) for a "Redemption Amount," they knew how to say that as well. Different words in same document have different meanings.

It is therefore abundantly clear from the language of the Sale Agreement that the Sweeneys' conveyance of their equity interest in VVD was a sale and that VVD and its related Debtors purchased that security. *See also* 11 U.S.C. § 101(16) (B) ("the term 'equity security' means – interest of a limited partner in a limited partnership.").

## 2. Relevant Caselaw Supports the Conclusion That a Sale Occurred, Meriting Protection under Section 546(e)

Section 5.07 of the Sale Agreement (A450) provides that the payments to the Sweeneys were governed by Internal Revenue Code (26 U.S.C.) section 736(b) (1), which pertains to partnership liquidation rather than the sale of partnership interests. Much like its opposition to the Sweeneys' motion to dismiss, the Plaintiff will undoubtedly point to this section and argue that the Sale Agreement was not a sale. To the contrary, this verbiage does not remove the protection of Bankruptcy Code section 546(e), for the reasons set forth in *Emory v. United States*, 374 F.Supp. 1051, 1055 (E.D. Tenn. 1972):

> A sale is a bilateral act of parties acting at arms' length which concludes with a property exchange. Inherent in a sale is a fixed or readily ascertainable amount of money, which is traded for something of value. In contrast, a liquidation is the process of reducing assets to cash, discharging liabilities and dividing surplus or loss. If the business continues, surplus or loss is determined by an accounting; and, the remaining partners pay the withdrawing partners for their interests. Thus, In a liquidation the amount received is contingent on the financial condition of the business at the time of dissolution. It is not a fixed sum or formula.

*Id.* (finding partnership agreement to be a sale). The Sale Agreement expressly contemplates a sale to the Debtors of the Sweeneys' interest in VVD in exchange for a fixed amount of money. The Sale Agreement does not provide that the payment to the Sweeneys is contingent on VVD's or the Debtors' financial condition; rather, the payment is fixed. The express language of the

Sale Agreement, coupled with how the transaction was structured, had all the indicia of a sale rather than a redemption  (like Mr. Forman's) liquidation or distribution.

The Third Circuit has held that a transaction in which a partnership acquires a partner's interest in the partnership, and the payments made to the partner are from the partnership business, Ii properly construed for tax purposes as a purchase and sale of a partnership interest rather than a liquidation.  *Foxman v. Comm'r of Internal Revenue*, 352 F.2d 466 (3d Cir. 1965). The agreement's language in *Foxman* was nearly identical to Sections 1.01 through 1.03 of the Sale Agreement between Debtors and the Sweeneys, in that the partnership agreed to purchase the withdrawing partner's interests in the partnership for a stated cash amount.  *Foxman*, 352 F.2d at 467-68.

Last, the plain language of Bankruptcy Code section 741(8), defining "settlement payment," does not require that a purchase or sale occur or that title to a "security" must pass for a transfer to be protected by Bankruptcy Code section 546(e).  *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. et al.*, 651 F.3d 329 (2d Cir. 2011) (holding early redemption of debtor's commercial paper issued prepetition is not excluded from definition of "settlement payments" and thus is protected by section 546(e) safe harbor).  The Second Circuit reviewed the definitions of "settlement payment" used by other courts of appeals and held that "settlement payment" may require an exchange of money or securities to complete a securities transaction, but it does not require that title change hands.  *Id.* at 337.  This Court should adopt the Second Circuit's analysis, and find the Agreement to be a sale of the Sweeneys' interests, and the 2007 Cash Transfer and Note Repayment protected by Bankruptcy Code section 546(e).

It would appear clear that the 2007 Cash Transfer and Note Repayment were "settlement payments" as defined in the Bankruptcy Code, as they were transfers of "cash or securities made to complete a transfer payment," *i.e.*, the sale of the Sweeneys' 8% equity stake in VVD.

*Resorts*, 181 F.3d at 515.  Furthermore, the 2007 Cash Transfer and Note Repayment were payments "made by a financial institution" – Credit Suisse.[3]  The Declaration of  Kurt Wilson (A412 *et seq*.) says as much: "The payment was made through Stewart Title Escrow Company by Credit Suisse on behalf of Valley View Downs," *id*. ¶ 10 (A414), in precisely the way that "settlement payments" are made by financial institutions on behalf of securities holders and beneficial owners.  Under the Third Circuit's broad interpretation of Bankruptcy Code section 546(e), it is clear that the 2007 Cash Transfer and Note Repayment are protected from any constructive fraudulent conveyance claim.  As such, Plaintiff is not entitled to summary judgment and the Motion must be denied.

    **C.**    **There Exist Genuine Disputes of Material Facts Concerning Solvency, Requiring Denial of Summary Judgment**

       Summary judgment should also be denied because genuine issues of material fact concerning the assertion of constructive fraud exist, especially in light of the larger picture presented by the corporate capitalization of the Debtors.  Section 548(a)(1)(B) of the Bankruptcy Code provides that a trustee may avoid transfers of a debtor's interest in property if the debtor voluntarily or involuntarily (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation, (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital, (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured, or (IV) made such transfer to or for the benefit of

---

[3] "Financial institution" means "a "Federal reserve bank, or an entity that is a commercial or savings bank, Industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer[] in connection with a securities contract."  11 U.S.C. § 101(22) (A).

an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business. 11 U.S.C. § 548(a)(1)(B).

Plaintiff must provide evidence sufficient to support all of the elements of a constructive fraud: (a) that the transfer occurred within the applicable time period; (b) a lack of reasonably equivalent value (or fair consideration); and (c) debtor's insolvency during the relevant time period. *Charys Liquidating Trust v. McMahan Sec. Co., L.P.* (*In re Charys Holding Co.*), 443 B.R. 628, 636 (Bankr. D. Del. 2010). Plaintiff fails to present such evidence, requiring that the Court deny summary judgment.

### 1. Failure to Demonstrate Lack of Reasonably Equivalent Value

With respect to the reasonably equivalent value or fair consideration aspect of constructive fraud, Plaintiff must do more than merely recite, "Valley View Downs did not receive reasonably equivalent value" for either the 2007 Cash Transfer or Note Repayment. Complaint, ¶¶ 33, 46. The transfers must be viewed at the time they occurred. 11 U.S.C. § 548(a) (1)(B). The complex corporate family capitalization represented in Credit Suisse's various offering documents, supported by numerous valuations and projections of the ventures' present worth and prospects at the time of the October 2007 financing, and the valuation of the Sweeneys' interest were obviously arrived at by arm's length negotiations among highly sophisticated parties, supported by carefully prepared reports of value and projections by experts in the field. This was thus "the 'deal world' equivalent of 'Lending 101,'" *In re Owens Corning*, 419 F.3d 195, 212 (3d Cir. 2005), rather than any sort of fraudulent transfer or series of transfers.

Solely because the Debtors were unable to obtain certain licensing *long after* the transactions in question did the value and solvency of VVD erode. A plaintiff "must describe the consideration and why the value of such consideration was less than the amount transferred." *Sarachek v. The Right Place Inc.* (*In re Agriprocessors, Inc.*), 2011 WL 4621741, at *6 (Bankr.

17

N.D. Iowa Sept. 30, 2011) (citing *In re Caremerica, Inc.*, 409 B.R. 737, 756 (Bankr. E.D.N.C. 2009)). The Plaintiff's expert report does not show that the 2007 Credit Suisse-engineered financing and lending to obtain complete control over VVD's equity and provide liquidity going forward was anything other than a garden-variety transaction which, due to forces beyond the participants' control long after it closed, did not pan out as planned. Nor can the Plaintiff's expert show that at the time of the 2007 closing there were any meaningful creditors of VVD owed anything close to the value transferred in the form of the 2007 Cash Transfer and Promissory Note. Indeed, the expert's report itself shows that at the time of these transactions, accounts payable and accrued expenses were negligible at best; only $100,000; and debt to an unrelated party was only $21 million, versus an "indicated enterprise value" of $382.7 million. The bulk of the debt is shown as owing to affiliate Centaur PA. Appendix to Motion for Summary Judgment, Exhibit A, at A18 and *passim*. In other words, the very parties, sophisticated institutional investors who put together and sold the transaction at valuations and on terms they had fully vetted, approved and enabled the very transaction they are now seeking to avoid.

Plaintiff alleges, and its expert report attempts to claim, that the 2007 Cash Transfer and the Note Repayment, totaling $11,199,000, were unreasonable because that would have required VVD to be valued at $140 million on the date of the transaction, and VVD was insolvent when it made the 2007 Cash Transfer and issued the Note on October 30, 2007. Complaint ¶ 21. (The Note Repayment was merely the payment of the antecedent debt to the Sweeneys incurred in 2007, not a new, separate transfer, and hence constituted reasonably equivalent value; *see* 11 U.S.C. § 548(d)(2).) It is inconceivable that Debtors could have been functionally insolvent, or rendered functionally insolvent, on October 30, 2007, when they had just received $800 million in financing fewer than 30 days before. And, as recited above, their own Motion

18

for Joint Administration recited that they were "leading domestic horse racing, off-track betting ("OTB") and casino operators" and generating positive cash flow as of the Petition Date. The Plaintiff's expert report ignores those facts, as well as the facts that the Debtors continued in operation for several years after the closing of the sale and had positive cash reserves from which to pay both operating expenses *and* the amounts due the Sweeneys and Mr. Forman under the Note in July 2008. Instead, it concludes that Debtors were insolvent without describing how, with a $382 million positive enterprise value and $800 million in financing received just weeks before, they were insolvent when the 2007 Cash Transfer and issuance of the Note occurred.

Furthermore, the satisfaction of a debt owed to the Sweeneys – namely the payment for the Sweeneys' equity interest in VVD pursuant to the Sale Agreement – constitutes payment of an antecedent debt and "value" for purposes of fraudulent transfer analysis. 11 U.S.C. § 548(d)(2). The Sweeneys were issued their equity stake in VVD in 2004 and sold it back to VVD at a negotiated price blessed by Credit Suisse and other sophisticated financial institutions and their experts once VVD secured "the last harness racing license in the State of Pennsylvania." Complaint ¶ 15. In full satisfaction of the Sale Agreement, the Sweeneys received the 2007 Cash Transfer and Note Repayment and conveyed their interests in exchange. The payment of the 2007 Cash Transfer and Note Repayment cannot now be set aside as a constructive fraudulent transfer. *Walker v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010) (applying the "totality of the circumstances" test, finding "when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.").

### 2. Plaintiff's Insolvency Is Belied by the Documentary Evidence

Plaintiff's expert's position that the Debtors were insolvent at the time of the transfers in question is belied by the fact that the 2007 Lien Facilities provided the Debtors with over

$800,000,000 in financing *not* primarily to satisfy the Debtors' obligations but to provide liquidity for the Venture going forward. *See* Flow of Funds Memorandum (A489-A502).[4]

As set forth in the Flow of Funds Memorandum, $80,639,409.35 in cash was wired by Credit Suisse to Stewart Title Guaranty Company, and the proceeds were specifically denoted to satisfy, among other claims, the 2007 Cash Transfer of $8,532,333 owed to the Sweeneys pursuant to the Sale Agreement. (A492; A501-502). As mandated by the Flow Of Funds Memorandum, Stewart Title Guaranty Company made the 2007 Cash Transfer to the Sweeneys.

Also as set forth in the Flow of Funds Memorandum, Centaur LLC received $18,381,147.97 in "excess funds" from the $800,000,000 in financing. (A497). Those funds were specifically allotted by Centaur LLC to pay off existing and current obligations, including the Note Repayment. Sweeney Decl., Exhibit A. After paying off these obligations, Centaur LLC still held a liquidity reserve of $11,064,138.21. *Id.*

The $800 million financing obviously was to provide Debtors liquidity for the march forward and, even i the f Debtors could have been considered insolvent at the time, to render them solvent. Plaintiff's expert report takes a different tack, concluding that, regardless of and ignoring the facts and circumstances surrounding the $800 million in financing and the express limitations in the Subsidiary Guaranties, the Debtors were still insolvent or became insolvent as a result, and that the transfers to the Sweeneys from the proceeds of the financing were constructively fraudulent. That assertion stands logic on its head.

Assuming, however, it were true for purposes of summary judgment, then Plaintiff as the fiduciary for estate creditors must necessarily believe that the entire $800 million financing was a

---

[4] Prior to the closing on the 2007 Lien Facilities, Credit Suisse's affiliate Credit Suisse Securities (USA) LLC issued to Centaur Inc. a "Centaur Pennsylvania LLC Highly Confident Letter" (Sweeney Decl., Exhibit B), whereby Credit Suisse stated it is "highly confident that it could as sole placement agent or sole managing underwriter" arrange for $455 million in financing. As we now know, the financing was wildly successful, with Credit Suisse actually able to raise almost *twice that amount* for the Debtors' use in financing their ventures going forward.

sham and should also be avoided. The financing closed in early October 2007 and the 2007 Cash Transfer and Note issuance occurred on October 30, 2007. Complaint, ¶ 20. Under Plaintiff's expert's theory, (i) the Debtors were insolvent before the financing, the financing was insufficient to make Debtors solvent, and caused Debtors to incur additional liabilities, thus deepening Debtors' insolvency; or (ii) the Debtors were solvent as of the closing of the financing, but were then insolvent less than 30 days later when the 2007 Cash Transfer and issuance of the Note occurred. If either scenario is true, then the Debtors, their principals, agents, and other representatives who put together the 2007 Lien Facilities were all involved in a massive fraud.

Assuming this to be correct, and there is no other explanation, then Plaintiff ought to have commenced avoidance lawsuits against every party that was involved in the closing of the 2007 Lien Facilities, including all professionals and financial institutions involved. But that "privilege" was reserved for a very small group of people like the Sweeneys who obviously were on the outside. Instead, Plaintiff has brought only a small number of lawsuits against certain individuals related to the proper repurchase of their equity interests in the various Debtors. Clearly, something is amiss when the Plaintiff can sue a small handful of former equityholders for the purchase of their interests in the Debtors, yet not sue the parties and professionals who created the mechanism for such a financing and allowed the transaction to close, when such a transaction either deepened the Debtors' insolvency or somehow the Debtors spent the $800 million and were left insolvent in less than one month.

### 3. Plaintiff's Parsing of Debtors' Solvency and Valley View Downs' Insolvency is of No Consequence

Plaintiff attempts to divert the Court's attention from the solvency issue by ignoring the reality of the $800 million capitalization. Ignoring the documented realities of how the 2007

Centaur family of companies was actually capitalized and how funds flowed, Plaintiff and its expert claim that VVD was the transferor, not Credit Suisse or the consolidated Centaur enterprise as had been presented to the investing community, and thus VVD's solvency is the only relevant factor in determining whether a constructive fraudulent transfer occurred. This argument has no basis in fact, and is clearly belied by both Credit Suisse's solicitation documents (Sweeney Decl., Exhibit E) and the Flow of Funds Memorandum (A489-A502).

The 2007 Lien Facilities closed on or about October 30, 2007, and the Flow of Funds Memorandum was issued as a result, detailing where the proceeds of nearly $800,000,000 in funding were to go. (A489-A502). Step 8 of the Flow of Funds Memorandum – entitled "Stewart Title Escrow" – provides that "[a]n aggregate amount equal to $80,639,409.35 will be wired by Credit Suisse to the account of Stewart Title Guaranty Company [] representing the sum of the amounts set forth on Schedule 1." (A492).

Schedule 1 to the Flow of Funds Memorandum shows that the payment of the 2007 Cash Transfer of $8,532,333 to the Sweeneys was to be made from Credit Suisse through the Stewart Title Escrow account. (A501-502).

Step 16 of the Flow of Funds Memorandum – tellingly entitled "Excess Funds" – provides that "all excess funds will be wired to Centaur, LLC." (A497). Centaur LLC received $18,381,147.97 in "excess funds" from the financing. *Id*. In addition, as shown on the Centaur Gaming General Corporate Uses Account Reconciliation (Sweeney Decl., Exhibit A), a portion of those funds, raised in 2007, was specifically allocated to repay the Note to the Sweeneys in 2008. After paying off those obligations, Centaur LLC still held a liquidity reserve of $11,064,138.21. *Id*. Thus, Centaur LLC was solvent when the Note was repaid, and the Debtors were solvent when Credit Suisse - via Stewart Title - made the 2007 Cash Transfer.

SL1 1369210v2 107213.00001

The $800 million financing obviously was to provide _all_ the Centaur enterprises, including VVD, with liquidity for continued operations and, if the Debtors could have been considered insolvent at the time, also to render them solvent.

The Flow of Funds Memorandum makes it clear that VVD did not make either transfer to the Sweeneys – the first transfer of $8,532,333 went from Credit Suisse through the Stewart Title Escrow account to the Sweeneys. The second transfer to the Sweeneys was from Centaur LLC, not VVD. Thus, it is wholly relevant whether the Debtors as a consolidated group were solvent at the time of the two transfers and the issuance of the Note. VVD, as part of the consolidated Debtors herein, benefitted from the $800 million funding and the liquidity the funding provided.

As such, summary judgment must be denied, because Plaintiff fails to demonstrate that the Debtors did not receive reasonably equivalent value and that Debtors were insolvent at the time of the 2007 Cash Transfer and delivery of the Note, leaving extant genuine issues of material fact.

## IV.    CONCLUSION

Because Plaintiff has failed to demonstrate the absence of a genuine factual issue _and_ failed to demonstrate an entitlement to judgment as a matter of law, Plaintiff's Motion for Summary Judgment must be denied in its entirety.

Dated:  June 9, 2015

STEVENS & LEE, P.C.

_/s/ Joseph H. Huston, Jr._
Joseph H. Huston, Jr. (No. 4035)
1105 North Market Street, 7th Floor
Wilmington, DE  19801
Telephone:  (302) 425-3310
Facsimile:  (610) 371-7972
Email:  jhh@stevenslee.com

-and-

SL1 1369210v2 107213.00001

Constantine Pourakis
485 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 319-8500
Email:  cp@stevenslee.com

*Attorneys for Defendants Joseph Sweeney and
Linda Porr Sweeney*