# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                                  :

                                                        :         Chapter 11

CENTAUR, LLC., *et al.,*[1]                             :

                                                        :         Case No. 10-10799 (KJC)
                                                        :         (Jointly Administered)

        Debtors.                                        :

                                                        :

_____                    :

FTI CONSULTING, INC., *as Trustee to the*              :
*Centaur, LLC Litigation Trust,*                        :

                                                        :

        Plaintiff,                                      :

v.                                                      :         Adv. Proc. No. 12-50423 (KJC)

                                                        :         (Re: D.I. 51)

JOSEPH SWEENEY and LINDA PORR                          :
SWEENEY                                                 :

                                                        :

        Defendants.                                     :

_____                    :

## OPINION[2]

### BY:    KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

FTI Consulting, Inc., in its capacity as the Trustee of Centaur LLC Litigation Trust (the

"Trustee"), filed a complaint against Joseph Sweeney and Linda Porr Sweeney (the "Defendants")

---

[1] The Debtors in this case are: Centaur LLC; Centaur Colorado, LLC; Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, L.P.; HP Dining & Entertainment, LLC; Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP, Centaur PA Land Management, LLC; Centaur PA Land, LP. Debtors Centaur PA Land, LP and Valley View Downs, LP filed their Chapter 11 petitions on October 28, 2009. Order dated April 16, 2010 approving joint administration of the Debtors' chapter 11 cases (Case No. 10-10799, D.I. 166). On March 15, 2013, the Court entered a Final Decree closing the Debtors' chapter 11 cases, except for Valley View Downs, L.P. (Case No. 09-13761) (Case No. 10-10799, D.I. 2305).

[2] This Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr. P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(A) and (b)(2)(H), and the Court has authority to enter a final order consistent with Article III of the United States Constitution.

to recover alleged fraudulent transfers by Debtor Valley View Downs, LP ("VVD") to the Defendants. The Trustee moved for summary judgment in his favor.[3] The Defendants oppose the summary judgment motion, contending that the Transfers are protected from avoidance under the "safe harbor" provisions of Bankruptcy Code § 546(e). The matter was taken under advisement. In May 2017, (with the parties' consent),[4] I suspended consideration of the Summary Judgment Motion after the United States Supreme Court granted certiorari to consider an identical issue.[5] The Supreme Court issued its decision in *Merit Management* in February 2018,[6] and the parties were invited to submit briefs discussing the impact of the Supreme Court's decision on the parties' respective positions in the Summary Judgment Motion.[7] The Trustee filed a supplemental brief,[8] but the Defendants did not.

For the reasons set forth below, the Trustee's Summary Judgment Motion will be granted.

## BACKGROUND

The following facts are undisputed. In October 2004, the Defendants acquired an 8% ownership interest in VVD pursuant to the terms of a Binding Memorandum of Understanding (the "MOU").[9]  The MOU concerned efforts by VVD, Centaur Pennsylvania, LLC and other related entities to construct a harness racing track and casino, known as a "racino," in

---

[3] Adv. D.I. 51 (the "Summary Judgment Motion").

[4] Adv. D.I. 79.

[5] *FTI Consulting, Inc. v. Merit Mgmt. Grp., LP*, 830 F.3d 690 (7th Cir. 2016), *cert. granted* 137 S. Ct. 2092 (2017).

[6] *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 200 L.Ed.2d 183 (2018).

[7] Adv. D.I. 80.

[8] Adv. D.I. 81.

[9] App'x in Support of Plaintiff's Motion for Summary Judgment (Adv. D.I. 53) (the "App'x") at A412 ¶3; A416 – A440.

2

Pennsylvania.[10] There were two prerequisites to operating the racino: (1) a racing license, and (2) a gaming license.[11]

VVD was awarded the last available racing license in the State of Pennsylvania in September 2007.[12] On October 1, 2007, VVD, Centaur Pennsylvania, LLC and related entities entered into an agreement with the Defendants (the "2007 Agreement") to acquire the Defendants' 8% minority partnership interest in VVD in exchange for payment of $11,190,000 (the "Purchase Price").[13] The Purchase Price would be paid by (i) an initial cash payment of $8,532,333 due on or about October 31, 2007 (the "Cash Transfer"), and (ii) a promissory note in the amount of $2,666,667 due on or about July 1, 2008 (the "Promissory Note") if certain conditions were met.[14]

On or about October 30, 2007, Centaur, LLC entered into credit agreements whereby Credit Suisse, Cayman Islands Branch ("Credit Suisse") agreed to act as the administrative agent and lender for revolving credit facilities and term loans to Centaur, LLC to finance various casino and racing facilities (including the planned Pennsylvania racino) and other related expenses of Centaur, LLC and its subsidiaries (the "Credit Suisse Financing").[15] In connection with the Credit Suisse Financing, Centaur, LLC and certain of its subsidiaries, including VVD, executed an intercompany note which, among other things, set forth specific terms by which Centaur, LLC could provide funds to VVD for the purpose of satisfying VVD's obligations to the Defendants

---

[10] App'x at A413, ¶ 4; A416 – A417.
[11] Id.
[12] App'x at 413, ¶ 5.
[13] Id. at A413, ¶6; A442-72.
[14] Id. at A413, ¶ 7; A442- 72.
[15] Id. at A413, ¶ 8; A383-A411.

under the October 2007 Agreement.[16] Under the intercompany note, VVD was liable for such funds advanced by Centaur, LLC.[17]

On October 30, 2007, VVD paid the Cash Transfer to the Defendants pursuant to the 2007 Agreement.[18] As shown in a Flow of Funds Memorandum dated October 30, 2007, the payment to the Defendants was made through Stewart Title Escrow Company, on behalf of VVD, with a portion of the proceeds from the Credit Suisse Financing.[19] On or about June 30, 2008, VVD paid the Promissory Note, plus interest, by transferring $2,769,397.62 to the Defendants (the "2008 Transfer").[20]

The Trustee's complaint alleges four counts of constructive fraud under the Bankruptcy Code and the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA").[21] Counts 1 and 2 seek to avoid the 2007 Cash Transfer of $8,532,333 from VVD to the Defendants pursuant to Bankruptcy Code sections 548(a)(i)(B) and 544(b), and PUFTA section 5105. Counts 3 and 4 of the Complaint seek to avoid the Promissory Note and the 2008 Transfer of $2,769,397.62 from VVD to the Defendants under the same statutes.

---

[16] *Id.* at 413, ¶ 9.

[17] *Id.*; A473- A487.

[18] App'x at A414, ¶ 10.

[19] *Id.*; A489 – A502.

[20] App'x at A414, ¶ 13.  The Cash Transfer and the 2008 Transfer are referred to herein as the "Transfers."

[21] PUFTA § 5105 contains the same standards as 11 U.S.C.A §548, and thus the two statutes are analyzed as one. *See Fidelity Bond & Mortg. Co. v. Brand*, 371 B.R. 708, 719 (E.D. Pa. 2007) ("The constructive fraud provisions of the PUFTA and the Bankruptcy Code should be construed and interpreted uniformly because consistency between the two statutes was a goal of those who drafted the PUFTA and who have since interpreted it.")

## DISCUSSION

### (a) Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[22] At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[23]

The moving party bears the burden of establishing the absence of a genuine dispute as to a material fact.[24] "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[25] When the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden."[26]

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."[27] Summary

---

[22] Fed. R. Civ. P. 56(a).

[23] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[24] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24, 106 S. Ct. 2548, 2552-53 91 L.Ed.2d 265 (1986)

[25] *Id.,* 477 U.S. at 323, 106 S.Ct. at 2553.

[26] *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

[27] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

judgment cannot be avoided by introducing only "a mere scintilla of evidence,"[28] or by relying on "conclusory allegations, improbable inferences and unsupported speculation."[29] "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment."[30]

Substantive law determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit will preclude summary judgment."[31] Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[32] The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party.[33]

A motion for summary judgment may be denied only when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."[34] The Third Circuit has held that "in all cases summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party, the Court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law."[35]

---

[28] *Sarko v. Penn-Del Directory Co.*, 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999).

[29] *J.Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5,8 (1st Cir. 1990)).

[30] *Id.* at 1251 (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)).

[31] *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

[32] *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result.").

[33]*Anderson*, 477 U.S. at 255, 106 S. Ct. at 2505 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[34] *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348 (citation omitted).

[35] *In re WL Homes, LLC*, 452 B.R. 138, 143 (Bankr. D. Del. 2011) (citing *Petruzzi's IGA Supermarkets v. Darling–Del. Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993)).

**(b) *Merit Management***

After the announcement of the *Merit Management* decision, the Trustee filed a supplemental brief in further support of his Summary Judgment Motion, claiming that *Merit Management* explicitly rejected the Defendants' § 546(e) defense.[36] I agree.

*Merit Management* is a case also arising out of the Centaur, LLC bankruptcy. The facts are similar to the case at hand.[37] VVD and Bedford Downs Management Corp. ("Bedford") were in competition for the last harness-racing license in Pennsylvania. In 2005, the Pennsylvania State Harness Racing Commission denied both applications. In 2007, the Pennsylvania Supreme Court upheld those denials, but allowed the companies to reapply. Instead of continuing to compete for the license, VVD and Bedford agreed that Bedford would withdraw as a competitor for the license and, in return, VVD would purchase all of Bedford's stock for $55 million after VVD obtained the license.

With Bedford out of the race, VVD was awarded the last racing license. VVD arranged for Credit Suisse to finance the $55 million purchase price for Bedford's stock as part of a larger $850 million transaction. Credit Suisse wired the money to Citizens Bank of Pennsylvania, which served as a third-party escrow agent for the transaction. The Bedford shareholders, including Merit Management Group, deposited their stock certificates into escrow. At closing, VVD received the Bedford stock certificates, and Citizens Bank disbursed $47.5 million to the Bedford shareholders. The remaining $7.5 million was held in escrow under an indemnification holdback period provided for in the parties' agreement. The holdback period ended in 2010, and Citizens Bank disbursed the remaining funds to the Bedford shareholders. Upon completion of the

---

[36] Adv. D.I. 81.

[37] *See Merit Mgmt.*, 138 S. Ct. at 891-92.

transaction, Merit received approximately $16.5 million from the sale of its Bedford stock to VVD.

Although VVD secured the racing license, it was unable to obtain the separate gaming license in the time frame set out in the loan documents. VVD and its parent company, Centaur, LLC, then filed chapter 11 bankruptcy petitions. The bankruptcy court confirmed a reorganization plan and appointed FTI to serve as trustee to the Centaur litigation trust.

FTI filed suit against Merit, seeking to avoid the $16.5 million transferred by VVD for the Bedford stock. The complaint alleged that the transfer was constructively fraudulent under § 548(a)(1)(B). Merit moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), contending that the § 546(e) safe harbor barred FTI from avoiding the transfer. Merit contended that the safe harbor provision applied because the transfer was a "settlement payment . . . made by or to (or for the benefit of)" a covered "financial institution" - - here, Credit Suisse and Citizens Bank.[38] The District Court granted judgment on the pleadings, reasoning that the § 546(e) safe harbor applied because the financial institutions transferred or received funds in connection with the "settlement payment" or "securities contract."[39] The Court of Appeals for the Seventh Circuit reversed.[40] The Supreme Court granted certiorari to resolve a conflict among the circuit courts as to the proper application of the § 546(e) safe harbor.

The Supreme Court described the issue as follows:

> [T]his Court is asked to determine how the safe harbor operates in the context of a transfer that was executed via one or more transactions, *e.g.*, a transfer from A → D that was executed via B and C as intermediaries, such that the component parts of the transfer include A → B → C → D. If a trustee seeks to avoid the A → D transfer, and the § 546(e) safe harbor is invoked as a defense, the question becomes: When determining whether the § 546(e) securities safe harbor

---

[38] *Merit Mgmt.*, 138 S. Ct. at 891-92.
[39] *Id.* (citing *FTI Consulting, Inc. v. Merit Mgmt. Grp., LP*, 541 B.R. 850, 858 (N.D. Ill. 2015)).
[40] *FTI Consulting, Inc. v. Merit Mgmt. Grp., LP*, 830 F.3d 690 (7th Cir. 2016), *cert. granted* 137 S. Ct. 2092 (2017).

saves the transfer from avoidance, should courts look to the transfer that the trustee seeks to avoid (*i.e.*, A → D) to determine whether that transfer meets the safe-harbor criteria, or should courts look also to any component parts of the overarching transfer (*i.e.*, A → B → C → D)?[41]

The Court began its analysis with the text of § 546(e).[42] The pertinent language provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a ... settlement payment ... made by or to (or for the benefit of) a ... financial institution ... or that is a transfer made by or to (or for the benefit of) a ... financial institution ... in connection with a securities contract ..., except under section 548(a)(1)(A) of this title.[43]

The Court determined that "[t]he very first clause—'Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title'—already begins to answer the question" because it "indicates that that § 546(e) operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions."[44]  The Court reasoned that the starting point of a § 546(e) inquiry is the actual transfer that the trustee seeks to avoid as an exercise of those powers.[45] The Court also noted that the last clause of § 546(e), "except under section 548(a)(1)(A) of this title," creates an "exception to the exception," by providing that the safe harbor does not apply to an intentional fraudulent transfer under § 548(a)(1)(A). "By referring back to a specific type of transfer that falls within the avoiding power, Congress signaled that the exception applies to the overarching transfer that the trustee seeks to avoid, not any component part of that transfer."[46]

---

[41] *Merit Mgmt.*, 138 S. Ct. at 888.

[42] *Id.* at 893.

[43] *Id.* (citing 11 U.S.C. § 546(e)).

[44] *Id.*

[45] *Id.*

[46] *Merit Mgmt.*, 138 S. Ct. at 893.

Moreover, the Court determined that the remaining text of § 546(e) confirms that the safe

harbor protects a transfer that *is* a "settlement payment" or made "in connection with a securities

contract."  The Court wrote:

> Not a transfer that involves. Not a transfer that comprises. But a transfer that is
> a securities transaction covered under § 546(e). The provision explicitly equates
> the transfer that the trustee may otherwise avoid with the transfer that, under the
> safe harbor, the trustee may not avoid. In other words, to qualify for protection
> under the securities safe harbor, § 546(e) provides that the otherwise avoidable
> transfer itself be a transfer that meets the safe-harbor criteria.[47]

The Court rejected arguments advanced by Merit, mostly analyzing amendments to the

statutory language or the purpose of the § 546(e) safe harbor.  Merit argued primarily that, by

adding the parenthetical "(or for the benefit of)" in 2006, Congress meant to abrogate a 1998

decision holding that the safe harbor was inapplicable to transfers in which a financial institution

acted only as an intermediary.[48] The Court noted that nothing in the text or legislative history

corroborates this proposition, and decided that a "simpler explanation" is that Congress added the

language to ensure that the scope of the safe harbor matched the scope of the avoiding powers,

since a number of the substantive avoidance provisions include the same language.[49]  "For

example, a trustee seeking to avoid a preferential transfer under § 547 that was made 'for the

benefit of a creditor,' where that creditor is a covered entity under § 546(e), cannot now escape

application of the § 546(e) safe harbor just because the transfer was not 'made by or to' that

entity."[50]

---

[47] *Id.* at 894.

[48] *Id.* at 895 (citing to *In re Munford, Inc.*, 98 F.3d 604, 610 (11th Cir. 1996)).

[49] *Id.* at 895. *See* § 547(b)(1) (avoiding power with respect to preferential transfers "to or for the benefit of a creditor"); § 548(a)(1) (avoiding power with respect to certain fraudulent transfers "including any transfer to or for the benefit of an insider ...").

[50] *Merit Mgmt.*, 138 S. Ct. at 895.

Merit further argued that the statute's inclusion of securities clearing agencies as covered entities under § 546(e) requires protection of intermediaries without reference to any beneficial interest in the transfer.[51] The Court disagreed that any contrary interpretation of the statute would render part of § 546(e) ineffective or superfluous. Instead, the Court held that if a transfer the trustee seeks to avoid was made "by" or "to" a securities clearing agency, then § 546(e) will bar avoidance, without regard to whether the securities clearing agency acted only as an intermediary.[52]

Finally, Merit argued that the broad language of § 546(e) shows that Congress intended to provide a "comprehensive approach to securities and commodities transactions" that was meant to "advance[e] the interests of parties in the finality of the transactions."[53] According to Merit "[t]here is no reason to believe that Congress was troubled by the possibility that transfers *by* an industry hub could be unwound but yet was unconcerned about trustees' pursuit of transfers made *through* industry hubs."[54] The Court determined that the plain language of the statute contradicted this explanation, writing:

> Because, of course, here we do have a good reason to believe that Congress was concerned about transfers "*by* an industry hub" specifically: The safe harbor saves from avoidance certain securities transactions "made by or to (or for the benefit of)" covered entities. See § 546(e). Transfers "through" a covered entity, conversely, appear nowhere in the statute. And although Merit complains that, absent its reading of the safe harbor, protection will turn "on the identity of the investor and the manner in which it held its investment," that is nothing more than an attack on the text of the statute, which protects only certain transactions "made by or to (or for the benefit of)" certain covered entities.[55]

---

[51] *Id.* at 896.
[52] *Id.*
[53] *Id.* (citing Brief for Petitioner 41-43).
[54] *Merit Mgmt.*, 138 S. Ct. at 896 (citing Reply Brief of Petitioner at 12-13 (emphasis in original)).
[55] *Merit Mgmt.*, 138 S. Ct. at 897.

Thus, the Court relied on a plain text interpretation of the statute and concluded that the relevant transfer in a safe harbor analysis is the overarching transfer the trustee seeks to avoid, not any component part of that transfer.[56]

## (c) Application of the law to the facts of this case

### i. § 548(a)(1)(B)

At issue, initially, is whether the payments to the Defendants were constructive fraudulent transfers.

Section 548(a)(1)(B) provides in pertinent part that the Trustee may avoid any transfer of an interest of a debtor in property or any obligation incurred by a debtor, within two years prior to the petition date, if the debtor voluntarily or involuntarily: (i) "received less than a reasonably equivalent value in exchange for such transfer or obligation;" and (ii) "was insolvent on the date that such transfer was made or such obligation incurred, or became insolvent as a result of such transfer or obligation."[57] There is no dispute that the Transfers occurred within the two-year look-back period of Section 548(a)(1)(B) or that VVD had an interest in the property transferred. However, the parties disagree about whether VVD received reasonably equivalent value in exchange for the Transfers, and whether VVD was insolvent at the time of the Transfers or became so as a result of the Transfers.

To prove his claims that the Transfers fall within the elements § 548(a)(1)(B), the Trustee submitted copies of VVD's balance sheet as of October 31, 2007, which show that VVD's liabilities exceeded its assets by at least $25 million.[58] The Trustee also retained an expert to prepare an estimate of the fair market value of the Defendants' 8% partnership interest in VVD

---

[56] *Id.* at 888, 897.

[57] 11 U.S.C. §548(a)(1)(B).

[58] App'x at A75.

12

on October 30, 2007, and to analyze the solvency of VVD on the same date and on June 30, 2008

(the dates on which the two payments were made).[59]  In response, the Defendants argue that the

Transfers must be valued at the time they occurred, which was before VVD was unable to obtain

the gaming license, and at the same time VVD's family of corporate entities benefitted from the

Credit Suisse Financing.  The Defendants contend that "[i]t is inconceivable that Debtors could

have been functionally insolvent, or rendered functionally insolvent, on October 30, 2007, when

they had just received $800 million in financing fewer than 30 days before."[60]

**Reasonably Equivalent Value**

The Third Circuit has defined "reasonably equivalent value" as "any benefit ... whether

direct or indirect ... [which includes any] 'opportunity' to receive an economic benefit in the

future."[61]  "To determine whether a benefit constitutes reasonably equivalent value, courts look

routinely to the totality of the circumstances of the transfer in balancing the following factors:

(1) the fair market value of the benefit received as a result of the transfer, (2) the existence of an

arm's length relationship between the debtor and the transferee, and (3) the transferee's good

faith."[62]

Even assuming (without deciding) that the Transfers from VVD to the Defendants were

negotiated at arms' length and in good faith, the value component tips the scale in favor of the

Trustee.  The Trustee's expert valued the Defendants' partnership rights at zero as of October 30,

---

[59] App'x at A7 – A73.  The Trustee's expert report was prepared by Ian Ratner, who has served as an expert witness in more than 80 complex commercial litigation cases, fraud investigations, and solvency-related valuations disputes.  App'x at A25 – A43.  He is a CPA, an ASA (Accredited Senior Appraiser, Business Valuation Section of the American Society of Appraisers), a CFE (Certified Fraud Examiner) and holds an ABV (Accredited in Business Valuation) designation for CPAs granted by the American Institute of CPAs.  App'x A25.
[60] Defendants' Br. in Opp. (Adv. D.I. 54) at 18.
[61] *TSIC*, 428 B.R. at 113 (citing *In re R.M.L.*, 92 F.3d 139, 148 (3d Cir. 1996)).
[62] *Id.* (citing *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006)) (internal punctuation omitted).

2007.[63] The Defendants dispute this and argue that the partnership rights should be valued in light of the partnership's prospects in 2007, which anticipated receiving a gaming license. The Defendants claim that the Credit Suisse Financing was intended to allow the Debtors to obtain complete control over VVD's equity and provide liquidity going forward, and the project's ultimate lack of success was due to forces beyond the participants' control long after the transaction closed. The Defendants attached copies of documents related to the Credit Suisse Financing to their brief in opposition to the Summary Judgment Motion.

Further review of the expert report, however, shows that the expert prepared a fair market value of the partnership interest "assuming the proposed racetrack and casino would be built in accordance with the contemporaneous projections prepared by Valley View Downs LP and/or its advisors."[64] The expert concluded that the enterprise value of VVD as of October 30, 2007 was $382.7 million, but if all the appropriate debt is considered, then VVD had no equity value and the value of the Defendants' partnership interests was "nil."[65] The Solvency Analysis Summary Schedule attached to the expert report shows that VVD's liabilities exceeded assets by $42.1 million on October 30, 2007; if VVD's co-guarantor debt based on the Credit Suisse Financing is included, then VVD's liabilities exceeded assets by $293.5 million.[66] Therefore, the Trustee asserts that the price paid by VVD to the Defendants for their partnership interests was objectively unreasonable, and no legitimate valuation method could have arrived at the amount of the Purchase Price. The Trustee also argues that the VVD transaction should not be conflated with the Credit Suisse Financing for the entire Centaur enterprise. If considered at all, the Trustee

---

[63] App'x at A7, A12-A17. The expert also opined that there is no indication that VVD became solvent between October 30, 2007 and June 30, 2008, the date of the 2008 Transfer. *Id.* at A7.

[64] *Id.* at A12.

[65] App'x at A12.

[66] *Id.* at A47.

14

argues that the Credit Suisse Financing only further encumbered VVD. I agree. The Defendants offer no evidence to rebut the Trustee's expert report; nor have they provided any convincing reason for valuing the partnership interests at the Purchase Price of more than $11 million. Based on this record, I cannot conclude that there was an exchange of reasonably equivalent value pursuant to Section 548(a)(1)(B).

**Insolvency**

The Bankruptcy Code defines "insolvent" to mean:

> [W]ith reference to a partnership, financial condition such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation - -
>
> (i) all of such partnership's property, exclusive of property [transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors]; and
>
> (ii) the sum of the excess of the value of each general partner's nonpartnership property, exclusive of property of the kind specified in subparagraph (A) of this paragraph, over such partner's nonpartnership debts.[67]

The Chief Financial Officer of Centaur, LLC and its subsidiaries submitted a declaration in support of the Trustee's Summary Judgment Motion stating that VVD's only general partner - - Valley View Downs GP, LLC - - had no assets, other than its 1% ownership interest in VVD at the time of the Transfers.[68] Therefore, I need review only the financial condition of VVD.

The parties' arguments about VVD's solvency are based largely along the same lines as those discussed above regarding reasonably equivalent value. The Trustee relies on VVD's balance sheet as of October 31, 2007[69] and August 31, 2008,[70] showing that VVD's liabilities exceeded its assets on those dates. Further, the Trustee relies on his expert's analysis of VVD's insolvency based on "an analysis commonly referred to as the adjusted balance sheet test

---

[67] 11 U.S.C. § 101(32)(B).
[68] App'x at A414, ¶ 14. *See also* corporate organization chart at A9.
[69] *Id.* at A75.
[70] *Id.* at A80 – A81.

("Balance Sheet Test"), pursuant to which a debtor is insolvent when the sum of its debts is greater than all of its property 'at a fair valuation.'"[71]  The expert concluded that VVD was insolvent as of October 30, 2007, and found no indication that VVD became solvent between October 30, 2007 or June 30, 2008.[72]  As described above, the expert's Solvency Analysis Summary Schedule attached to his report shows that VVD's liabilities exceeded assets by $42.1 million on October 30, 2007; and if VVD's co-guarantor debt based on the Credit Suisse Financing is included, then VVD's liabilities exceeded assets by $293.5 million.[73]

In response, the Defendants rely on the Flow of Funds Memorandum in connection with the Credit Suisse Financing, which provided Centaur LLC with $18,381,147.97 in "excess funds," part of which were used to make the payments on behalf of VVD to the Defendants.[74]  The Defendants argue that "[a]fter paying off these obligations, Centaur LLC still held a liquidity reserve of $11,064,138.21."[75]

The Defendants imply that a reserve of Centaur, LLC is also a reserve for VVD. However, VVD was just one of many companies operating under the Centaur, LLC umbrella. The Defendants have not provided any reason to fuse Centaur, LLC's financial condition with VVD's. The Defendants have not offered any evidence to counter the Trustee's evidence that VVD was

---

[71] *Id.* at A10 – A11.  The expert also noted "it is generally accepted that 'at fair valuation' means Fair Market Value," (A11) which is defined as: "the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts." (A7, citing International Glossary of Business Valuation Terms adopted by the ASA, AICPA and other standard-setting business valuation professional associations).

[72] App'x at A7, A18-A19, A47

[73] *Id.* at A47.

[74] App'x A492, A501 – A502.

[75] Defendants' Br. in Opp. (Adv. D.I. 54) at 20 (citing Sweeny Decl. Ex. A "Centaur's Gaming General Corporate Uses Account Reconciliation as of October 30, 2007).

insolvent at the time of the Transfers. Moreover, the Trustee's evidence shows that VVD was insolvent on the relevant dates in an amount far in excess of the amount of the Transfers.

Based on the record before me, I conclude that the Transfers are avoidable under Bankruptcy Code § 548(a)(1)(B).

ii. § 546(e)

The Defendants argued that the Transfers are protected under § 546(e) safe harbor based on the Third Circuit's broad interpretation that a settlement payment made by a "financial institution" is exempt from a constructive fraudulent transfer claim.[76] The Defendants assert that the Cash Transfer and the 2008 Transfer were "settlement payments" (as defined in section 741 of the Bankruptcy Code) made by a "financial institution" - - here, Credit Suisse.[77]

However, as discussed in detail above, this broad interpretation of the safe harbor in § 546(e) was rejected by the Supreme Court in *Merit Management*. As *Merit* provides, the important transaction under review is the transfer that the Trustee seeks to avoid: here, VVD to the Defendants. The inquiry does include intermediaries within the transaction, such as Credit Suisse or Stewart Title Escrow Company. Neither VVD nor the Defendants is a financial institution.[78] Accordingly, the § 546(e) safe harbor does not apply to this transfer.

(d) Interest

---

[76] *In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999), *abrogated by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 200 L.Ed.2d 183 (2018); *In re Plassein Int'l Corp.*, 590 F.3d 252 (3d Cir. 2009).

[77] Defendants' Br. in Opp. (Adv. D.I. 54) at 16.

[78] Bankruptcy Code § 101(22) provides that the term "financial institution" means - - (A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer; or (B) in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940.

The Trustee requested both pre- and post-judgment interest, however the parties did not address these issues in their submissions. [79] Therefore, the Trustee will be given leave to request pre- and post-judgment interest.

## CONCLUSION

For the foregoing reasons, the Trustee's Summary Judgment Motion will be granted. An appropriate order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: December 27, 2018

---

[79] *See In re USN Commc'ns Inc.,* 280 B.R. 573, 602-03 (Bankr. D. Del. 2005) (addressing both pre- and post-judgment interest, and finding pre-judgment interest appropriate).